Filed 6/30/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CINEMA WEST, LLC, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> CHRISTINE BAKER et al., <br><br>     Defendants and Respondents. | A144265 <br><br> (Sonoma County <br> Super. Ct. No. SCV254439) |

This appeal concerns whether the construction of a movie theater built by Cinema West, LLC in Hesperia, California qualifies as a "public work" within the meaning of California's prevailing wage law (Lab. Code, §§ 1720–1861[1]) (the PWL), which provides that, with certain exceptions, the prevailing wage "shall be paid to all workers employed on public works." (§ 1771.) In administrative proceedings initiated by a labor union, respondent Christine Baker, Director of the State Department of Industrial Relations (Director),[2] concluded that it did. Cinema West filed a petition for writ of mandate challenging the Director's decision, which the superior court denied. This appeal followed. Applying substantial evidence review to the superior court's factual findings and de novo review to its application of the PWL to the facts, we find no error and therefore affirm.

---

    [1] All further statutory references are to the Labor Code unless otherwise indicated.

    [2] Cinema West's writ petition named the Director and the Department of Industrial Relations (Department), which she heads, as respondents. For convenience, we will refer to respondents collectively as the Director.

1

## BACKGROUND

### *Facts*

In 2004, the City of Hesperia (City)[3] began acquiring vacant property in its downtown to facilitate development of a Civic Plaza, which was to include a city hall, public library, other government buildings and "complimentary retail, restaurant, and entertainment establishments." The City's goal was "to develop a vibrant, participatory multi- and mixed-use civic/downtown environment."

Hesperia did not have a movie theater. From 2000 to 2010, it met with numerous theater operators in an effort to facilitate construction of a "state-of-the-art cinema experience in Hesperia." For predominantly financial reasons, no company had built a theater during that period. In 2010, the City met with appellant Cinema West, LLC (Cinema West), who "articulated a cogent plan to develop a new, 12-screen digital cinema immediately west of the Civic Plaza Park."

Cinema West's proposal, according to a City staff report, included the following "[d]eal points": the City would convey about 54,000 square feet of real property to Cinema West for $102,529, the property's fair market value; Cinema West would construct a "38,000 square foot, twelve-screen digital theatre"; the City would construct "the necessary parking lot and provid[e] reciprocal access and use of said parking lot," develop a water retention system for the theater and the parking lot, and install "off-site improvements including curb, gutter and sidewalks"; Cinema West would execute a ten-year operating agreement with the City.

---

[3] The City's redevelopment agency, known as the Hesperia Community Redevelopment Agency (HCRA), was the party to the discussions and agreements with Cinema West, although the City Council of Hesperia acted as the legislative body of the HCRA. In 2011, the Legislature enacted legislation dissolving all redevelopment agencies and transferring control of their assets and responsibility for their obligations to the cities and counties that had created them. (See Health & Safety Code, §§ 34172, 34173, 34175, subd. (b), 34177.) The City of Hesperia became the successor agency to the HCRA, assuming control of its assets and responsibility for its obligations. For convenience, except as otherwise specifically indicated, we will refer to the former HCRA and the City individually and collectively as "the City."

2

The city manager and staff analyzed the fiscal impacts of the project.**[4]** According to their September 7, 2010 report, development of the parking lot and related amenities would cost "approximately $1,443,834," and the fair market value of the property being conveyed was $102,529, resulting in a total cost to the City of $1,546,363. This amount would be paid out of the City's Economic Development Fund or other City resources. The project would have a negative rate of return, a negative net present value and a lengthy payback period. However, these costs would be partially offset by annual property taxes of $32,882, annual sales taxes of over $8,000 and development-related fees of approximately $227,486. Further, there would be other benefits to the City, including its ownership of and access to the parking lot for "the City and surrounding civic uses." Although "the net benefit of the DDA [Disposition and Development Agreement between the City and Cinema West] to the [City] is a negative number," the city manager and staff informed the mayor and city council that "the Project is worthwhile and will result in the development of a long-awaited entertainment amenity which will benefit the community," "catalyze future retail and restaurant development proximate to the Civic Plaza and downtown," and bring new jobs, increased foot traffic and associated spending to the area that would benefit local businesses.

On September 7, 2010, after reviewing the staff report and conducting a public hearing, the City adopted resolutions approving the DDA and authorizing its execution. Among the resolutions' recitals were that "the [City] desires to encourage commercial growth within the Project Area"; "in furtherance of the public purposes of the [City] and the Project Area, Cinema West, LLC (Developer) desires to enter into a [DDA] with the [City] in order to purchase 54,248 square feet of real property located at the southeast corner of Smoke and 9th, Hesperia, California (Site), in order to develop and operate a 36,000 square foot theater (Project)"; and "[i]n order to ensure the sustained economic

---

**[4]** In the staff reports, resolutions and project documents, the City and Cinema West used the term "Project" to refer to the theater only, and described the parking lot as a related and adjacent amenity to be constructed and funded by the City for the benefit of the theater and other uses.

3

viability of the Project, the Developer has requested certain forms of [City] participation as more fully described in the DDA."

On or about September 7, 2010, the City and Cinema West entered into the DDA and, as a part of it, a series of related documents and agreements, including an operating covenant; a reciprocal access and easement agreement; covenants, conditions and restrictions (CC&Rs); a promissory note; and deed of trust.

Under these agreements, Cinema West agreed (1) to purchase property from the City at a fair market value determined to be $102,529; (2) to develop the site with a 12-screen, 36,000 square foot movie theater; (3) to obtain financing for, and bear the costs of, construction of the theater and related facilities other than the parking lot; to obtain necessary entitlements, approvals and permits; to create at least 40 employment positions on the site; to maintain the property, including landscaping and the on-grade parking lot; and to operate the site as a movie theater for at least ten years.

The City agreed to convey fee simple title to the theater site to Cinema West; to approve or disapprove all conceptual site plans submitted by Cinema West; to ensure the project complied with the California Environmental Quality Act (CEQA); to issue a certificate of completion after construction was satisfactorily completed; to deliver the property in buildable condition, including a rough graded pad for the theater; to develop an on-grade parking lot adjacent to the site for use by Cinema West, its assigns and invitees as a parking lot for the movie theater; to provide Cinema West a reciprocal access and parking easement for the parking lot; to process certain zone changes and plan amendments; upon issuance of a certification of completion for the theater, to provide an interest-bearing loan to Cinema West of $1,546,363 forgivable over ten years and a one-time payment of $102,529 as consideration for the operating covenant.

The DDA stated that the City was not "providing any financial assistance to [Cinema West] in connection with [Cinema West's] acquisition of the Site or development of the Project thereon" and that Cinema West "is paying fair market value to acquire the Site and is responsible for paying the full costs of all improvements to be constructed on the [theater] Site," including for "compliance with CEQA; grading and

4

Site preparation; building construction; Site development and infrastructure; design; building permit and development fees; and financing." The minimum investment for these costs was to be $7,473,159. The DDA further stated, however, that "[n]otwithstanding the foregoing, as described in Sections 606 and 607 of this Agreement, [City] will purchase an Operating Covenant from Developer, should Developer construct and operate the Project contemplated herein." In section 606 of the DDA, entitled "the Operating Covenant," Cinema West agreed to operate the project as a movie theater on the site for at least ten years after completion of the project, and to obtain the City's approval for any ancillary uses. In section 607, the City agreed to "purchase the Operating Covenant" from Cinema West by providing the "forgivable loan" to Cinema West in the amount of $1,546,363. Section 607 further stated that the City was "not providing any financing for the project and the Note is intended only to acknowledge an obligation on Developer should the need arise to seek repayment for the funds expended by the [City] in purchasing the Operating Covenant." Repayment of the loan by Cinema West would be required only in the event it defaulted on the operating covenant.

The operating covenant provided that in addition to the $1,546,363 forgivable loan it would make a "one-time payment" to Cinema West of $102,529—also as consideration for the operating covenant. The outstanding balance on the "loan" would be earned in equal annual installments of the principal plus accrued interest over a ten-year period. If Cinema West defaulted on the operating covenant and failed to cure, it was required to repay the City all unearned funds with any interest accrued on those funds.

In exchange for this "compensation," Cinema West would: "(a) continuously operate the Project on the Site,[5] (b) provide the [City] with free advertising prior to each movie showing, and (c) comply with all provisions of the Declaration of Covenants, Conditions and Restrictions ('CC&Rs') for the Project as required by the DDA." The

_____

[5] The "Site" is used in the documents to mean the portion of the property conveyed by the City to Cinema West.

5

CC&Rs provide that Cinema West "may only use the Site for a movie theater," will "maintain[] and repair . . . the Site and adjacent [City]-owned parking lot . . . and all related on-site improvements . . . in a first class condition and repair" and will pay "all related utility expenses (water and electricity)" and "all real estate taxes and assessments levied against the Site."

In the Reciprocal Access and Parking Agreement, the City granted Cinema West "a non-exclusive easement for vehicular and pedestrian ingress, egress, and parking, and for drainage, maintenance, and public utility purposes across, over and upon the Parking lot." The easement was "solely for the benefit of the Site." The City retained the right to make use of the parking lot, "provided . . . such use shall not interfere unreasonably with the use or enjoyment of the Easement by the then Site owner." Cinema West was required to maintain the parking lot and pay the utilities associated with it.

An August 2010 report prepared by the City pursuant to Health and Safety Code section 33433[6] (Summary Report), which summarized various aspects of the DDA, including the "Costs of the DDA to the [City]," sheds light on the nature of the $1,546,363 "forgivable loan." It states: "The [City's] costs to implement the DDA include . . . certain development costs." Specifically, "the City will buy an operating covenant from [Cinema West] by developing and paying for costs related to the on-grade parking lot shared by the theater. Said costs shall be repaid to the [City] if all conditions of the Operating Covenant are not honored by Developer, however, if after the end of ten years from the effective date of the DDA, it is determined that [Cinema West] has honored all of the requirements of the Operating Covenant, then [the City] shall deem costs of development to be earned, and will relinquish any financial obligation to repay

---

[6] That section requires that before any property of a redevelopment agency acquired with tax increment moneys is sold or leased for development pursuant to a redevelopment plan, the sale or lease shall first be approved by the legislative body by resolution after public hearing, and further requires that the agency make available for public inspection and copying a report containing certain information about the cost, value and purchase price or lease payments. (Health & Safety Code, § 33433, subds. (a)(1) & (2).)

6

the [City]."  A staff report prepared in December 2011 is consistent, stating "the DDA did commit, among other covenants, to invest $1,546,363 into the construction of an on-grade parking lot for the benefit of the Project and adjacent park."

The parties executed the DDA in November 2010.  In the ensuing months, Cinema West secured financing for the theater project and pursued various permits and other entitlements from the City.  In the meanwhile, the costs for the theater construction rose due to an increase in steel prices and the City's adoption of new building codes.  In view of these changes, the city council adopted a resolution in December 2011 making a $250,000 additional forgivable loan to Cinema West to aid with a $700,000 anticipated shortfall in funds for the theater project.  The parties executed a second operating covenant providing a $250,000 forgivable loan as consideration.[7]

Cinema West commenced construction of the theater in February 2012 and completed it in December 2012.  In June 2012, the City entered into a contract with Cooley Construction, Inc. to construct the parking lot, which was completed shortly before the theater opened.

### Administrative Proceedings

In November 2012, as development of the theater and parking lot was nearing completion, the International Brotherhood of Electrical Workers Local 477 (Union) submitted to the Director a request for a public works coverage determination for the Cinema West theater and related facilities project.  It submitted copies of various documents relating to the theater and parking lot developments, including City staff reports, and resolutions, the DDA, and other documents reflecting the agreement between the City and Cinema West.

The Department wrote to Cinema West and the City in December 2012, notifying them of the coverage request and requesting certain information and documents.  Cinema West submitted a brief letter arguing the theater was a private development on

---

[7] Cinema West's briefs do not explain the relationship between the two operating covenants other than to say that the second was the result of renegotiations of the compensation and added "only a forgivable loan for $250,000."

7

property for which Cinema West had paid fair market value, no public financial assistance was involved, there was "no evidence to suggest that the parking lot was built because it was needed to serve the Project," that the "forgivable loan" was something Cinema West agreed to pay if it failed to comply with the DDA, but that "no public funding is associated with the loan" and the purchase of the operating covenant had not been consummated. Based on these assertions, Cinema West requested "a determination that the . . . movie theater is not a public works project and is not subject to prevailing wage requirements." Cinema West did not submit any documents or other evidence. The City provided documents but took no position on the coverage issue.

In March 2013, the Director issued her determination that "the construction of a movie theatre and related facilities (Project) is a public work subject to prevailing wage requirements." In reaching this conclusion, the Director first determined the scope of the construction project. The Union "consider[ed] the theatre construction, the parking lot improvements and the related infrastructure improvements to be a single project," whereas implicit in Cinema West's contention that no public funds were used was that the relevant construction project was the theater alone. The Director agreed with the Union, stating: "Given the very specific terms of the DDA and the mutual agreements of the parties to construct all these improvements in tandem to serve the theatre complex there is no doubt the 'Project' includes all the elements specified in the DDA to create a single complete and integrated theatre complex." The Director then identified "three separate sources of public funds utilized on the Project": the City's one-time payment of $102,529 to Cinema West upon the filing of a notice of completion for the theater; the two forgivable loans made by the City to Cinema West of $1,546,363 and $250,000 in connection with the operating covenants; and "the construction of the adjacent parking lot, a water retention system for the theater and parking lot, and the installation of off-site improvements to curbs, gutters and sidewalks." Based on these "public subsidies," the Director concluded the theater development was a public work subject to the requirements of the PWL. This was true whether the project was considered the theater

8

alone or more broadly the theater and the parking lot, because in either event there were public subsidies that supported the development of the theater.

In April 2013, Cinema West filed a timely administrative appeal. In its appeal, it requested a hearing "so that it may develop a factual record suitable for judicial review." It proffered no evidence, though its brief asserted some facts that had not been presented to the Director prior to her initial decision.[8]

In July 2013, the Director issued a final determination on appeal affirming her initial decision. In that opinion, she addressed the new factual assertions raised by Cinema West, accepting some and rejecting others that were contradicted by the evidence. Ultimately, they did not change her analysis. Thereafter, the Department's Division of Labor Standards Enforcement (DLSE) commenced wage enforcement proceedings against Cinema West and the contractors and subcontractors who constructed the theater. The hearing officer appointed to hear those matters, after consolidating them, stayed those proceedings pending a final decision in this matter.

### Superior Court Writ Proceedings

Cinema West timely filed a petition in the Superior Court of Sonoma County for a writ of mandate under Code of Civil Procedure section 1085 challenging the Director's decision. It sought a peremptory writ commanding the Director to determine that the theater is not a public work and an injunction against all actions premised on the Director's "erroneous determination" to the contrary, and also requested an immediate

---

[8] These included that: (1) the City had previously planned to construct a parking lot with water retention facilities on the site; (2) a City survey had established there was enough parking in existing City-owned lots and on-street to service the theater even without the new parking lot; (3) the lot purchased by Cinema West would not be "buildable" without water retention facilities; (4) the funds for the $102,529 one-time payment and the $1,546,000 forgivable loan never changed hands; (5) Cinema West agreed to compensate the City for the parking lot easement by paying for lighting and maintenance of the parking lot; the forgivable loan for $250,000 was to compensate Cinema West for its commitment to operate the theater for 10 years, and these funds "never changed hands"; and (6) Cinema West had recently advised the City it was unable to meet certain obligations of the operating covenant and would not accept the loans thereunder, though it hoped to renegotiate those issues.

9

stay of "all of the actions of Respondent premised upon its erroneous Determination." Cinema West submitted evidence not in the administrative record, including statements in its verified petition and three declarations. It argued the court should consider this evidence because the Director's denial of Cinema West's request for a hearing prevented it from making an evidentiary record.

The Director opposed the petition and filed objections to the Cinema West's extra-record evidence.

At the hearing, Superior Court Judge Gary Nadler ordered the parties to submit supplemental briefing to address, among other things, the extra-record evidence. After the parties submitted those briefs, the court issued its decision. The court sustained the Director's objections to Cinema West's extra-record evidence, finding Cinema West should have presented the evidence in the administrative proceedings and "did not avail itself of the opportunity" to do so. Concluding that the evidence *in* the record was undisputed, the court determined, based on that evidence, that the project was a public work. The judgment denying the writ was issued on December 18, 2014.

Cinema West then timely filed this appeal.

## DISCUSSION

### *The Prevailing Wage Law*

"The conditions of employment on construction projects financed in whole or in part by public funds are governed by the prevailing wage law." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 985.) "The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects." (*Ibid*.) "Section 1771 [of the PWL] provides that not less than the general prevailing rate of wages must be paid to all workers employed on public works projects costing more than $1,000." (*Ibid*.) As a prevailing wage law, the PWL "is liberally construed to further its purpose." (*Azusa Land Partners v. Department of Industrial Relations* (2010) 191 Cal.App.4th 1, 15.)

Section 1720 broadly defines "public works" to mean, with an exception not relevant here, "[c]onstruction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds." (§ 1720, subd. (a).)

10

" '[C]onstruction' includes work performed during the design and preconstruction phases of construction, including, but not limited to, inspection and land surveying work, and work performed during the postconstruction phases of construction, including, but not limited to, all cleanup work at the jobsite." (*Ibid.*)

The phrase "paid for in whole or in part out of public funds" in section 1720 is also broadly defined.  It encompasses both direct and indirect subsidies, including "[t]he payment of money or the equivalent of money by the state or political subdivision directly to or on behalf of the public works contractor, subcontractor, or developer"; "[p]erformance of construction work by the state or political subdivision in execution of the project"; "[t]ransfer by the state or political subdivision of an asset of value for less than fair market price"; "[f]ees, costs, rents, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision"; "money loaned by the state or political subdivision that is to be repaid on a contingent basis"; and "[c]redits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision."  (§ 1720, subd. (b)(1)–(6).)  The statute excepts from this otherwise broad definition of public funding "a public subsidy to a private development project that is de minimis in the context of the project."  (§ 1720, subd. (c)(3).)

The Director is responsible for setting prevailing wage rates using a methodology set out in the Labor Code (§§ 1773, 1773.4, 1773.9) and, on request, determining "whether a specific project or type of work awarded or undertaken by a political subdivision is a public work."  (§ 1773.5, subds. (b), (c).)  The Director undertakes a coverage determination when a request is made to her in regard to a specific project or type of work.  (*Id.*, subd. (b); Cal. Code Regs., tit. 8, § 16001, subd. (a)(1).)  Any interested party may request a determination either that a specific project or type of work is subject to or excluded from coverage as a public work.  (Cal. Code Regs., tit. 8, § 16001, subd. (a)(1).)

11

If the request is made by a party other than the awarding body, the requesting party must serve a copy of the request on the awarding body. (Cal. Code Regs., tit. 8, § 16001, subd. (a)(1).) All parties to the coverage determination request have a continuing duty to provide the Director with relevant documents in their possession or control until a determination is made. (*Id*., subd. (a)(3).)

After the Director makes a coverage determination, interested parties may appeal. (Cal. Code Regs., tit. 8, § 16002.5, subd. (a).) An appealing party may request a hearing, and the decision whether to hold one is "within the Director's sole discretion." (*Id*., subd. (b).) The Director's authority to determine coverage of projects or types of work under the PWL is "quasi-legislative," and "subject to judicial review pursuant to Section 1085 of the Code of Civil Procedure." (§ 1773.5, subd. (d); Cal. Code Regs., tit. 8, § 16002.5, subd. (c).)

### *Standard of Review on Appeal*

Cinema West filed this action as a petition for a writ of mandate under Code of Civil Procedure section 1085 pursuant to section 16002.5, subdivision (c) of the Department's regulations. (Cal. Code Regs., tit. 8, § 16002.5, subd. (c).) "Our Supreme Court has treated the question of whether the PWL applies to a specific project as a question of statutory interpretation to which a court applies its independent judgment, rather than reviewing to determine whether the agency's decision was arbitrary and capricious. [Citation.] Therefore, except to the extent that we defer to any findings of fact made by the trial court that are supported by substantial evidence, 'we must exercise our independent judgment in resolving whether the project at issue constituted a "public work" within the meaning of the PWL.' [Citation.] 'Where . . . the facts are undisputed, and the purely legal issues involve the interpretation of a statute an administrative agency is responsible for enforcing, we exercise our independent judgment "taking into account and respecting the agency's interpretation of its meaning." . . . The agency's interpretation is " 'one of several interpretive tools that may be helpful. In the end, however, [the court] must . . . independently judge the text of the statute." ' " ' "

12

(*Hensel Phelps Construction Co. v. San Diego Unified Port Dist.* (2011) 197 Cal.App.4th 1020, 1030.)

In reviewing the trial court's findings for substantial evidence, "we resolve all conflicts in favor of the prevailing party, indulging in all legitimate and reasonable inferences from the record. When a finding is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence in the record, contradicted or uncontradicted, that will support the finding." (*Associated Builders & Contractors, Inc. v. San Francisco Airports Comm.* (1999) 21 Cal.4th 352, 374 (*Associated Builders*).)

### *The Superior Court Did Not Err in Declining to Consider Extra-Record Evidence.*

Cinema West contends the superior court erred when it refused to consider declarations and statements in a verified petition that Cinema West proffered for the first time in that court. Cinema West claims, as it did in the trial court, that the Director denied Cinema West a hearing and thus "did not afford Cinema West any meaningful opportunity to appear and present evidence on its behalf," thereby violating Cinema West's right to due process. Judge Nadler carefully considered Cinema West's argument, indeed asking for supplemental briefing on the subject, and found it unpersuasive. It is equally unpersuasive to this court.

As Judge Nadler pointed out, "[i]t is well established that use of extra-record evidence is limited and generally improper since review is normally confined to the record." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570–579 (*Western States*); *San Joaquin Local Agency Formation Comm. v. Superior Court* (2008) 162 Cal.App.4th 159, 167; 8 Witkin, Cal. Procedure (2017 supp.) Extraordinary Writs, § 177, p. 196.) Cinema West contends *Western States* is distinguishable because the administrative agency in that case was making a decision under CEQA and "went out of its way to facilitate the development of an extensive evidentiary record in which all of the stakeholders were allowed to participate." Cinema West claims the Director made no such effort here, and that the record in this case "consists of little more than the one-sided case prepared by the Union."

13

Cinema West provides no authority for the proposition that the extra-record evidence bar articulated in *Western States* is limited to CEQA cases. But as the court stated in that case, "[i]t is well settled that extra-record evidence is generally not admissible in *non-CEQA* traditional mandamus actions challenging quasi-legislative administrative decisions." (*Western States*, *supra*, 9 Cal.4th at p. 574, italics added.) Far from creating a rule specific to CEQA, the court was applying a rule of general application in a CEQA case. (See *Western States*, at pp. 574–575 ["there is no sound reason why CEQA and non-CEQA cases should be governed by different evidentiary rules"].) Further, much of the court's reasoning in *Western States* applies beyond the CEQA context. This includes its observation that where the scope of review of factual findings is substantial evidence, review limited to the administrative record is appropriate because extra-record evidence is irrelevant to whether the agency's decision is supported by substantial evidence. (*Western States*, at pp. 570–571; see also *id*. at p. 572 ["Were we to hold that courts could freely consider extra-record evidence in these circumstances, we would in effect transform the highly deferential substantial evidence standard of review . . . into a de novo standard"].) The same is true of the court's rationale that where the Legislature has delegated quasi-legislative authority to the agency, permitting admission of extra-record evidence would "conflict with the well-settled principle that the legislative branch is entitled to deference from the courts because of the constitutional separation of powers." (*Id*. at p. 572; and see § 1773.5, subd. (d) [delegating to Director "quasi-legislative authority to determine coverage of projects or types of work under [PWL]"].) Finally, our courts have applied the *Western States* rule in contexts other than CEQA, treating it as generally applicable to "traditional mandamus actions challenging quasi-legislative decisions." (*San Joaquin Local Agency Formation Comm. v. Superior Court*, *supra*, 162 Cal.App.4th at pp. 167–168 [decision on utility district's application to SJ LAFCO to allow it to provide retail electric service]; see *Associated Builders*, *supra*, 21 Cal.4th at p. 374 [decision by airport commission to adopt project labor agreement as bid specification for construction project].)

14

Cinema West implies that there is an exception to the extra-record evidence rule when the court deems the administrative record inadequate or the agency's efforts to develop a record wanting, but it cites no authority for this proposition. Nor does it explain what criteria the court should consider in determining the adequacy of such record or efforts. Regardless, Cinema West has failed to demonstrate any inadequacy in the PWL coverage proceedings before the Director or in the record there developed. The coverage determination was initiated by the Union, which submitted documentation pertaining to the Hesperia theater and parking lot development. The documents the Union submitted consisted entirely of public records pertaining to the development. While characterizing the Union's evidence as "one-sided," Cinema West does not contend that any of the documents submitted by the Union are not genuine, and the City submitted copies of many of the same documents in response to the Director's request. It does not suggest any pertinent documents are missing from the record. And contrary to Cinema West's suggestion that the Union's proffered evidence was all that was submitted, the record reflects that both the City and Cinema West were provided notice of the proceedings and given the opportunity to submit any documents in their possession bearing on the issues. The Director twice requested documents from the City, indicating her intent to have a complete record.

It was in this context that the trial court found Cinema West had the opportunity, but *chose not to*, submit any evidence in the initial proceeding or the appeal. Cinema West makes much of the fact that it sought and was denied a hearing on its administrative appeal but, as the trial court observed, a hearing was "not a prerequisite for an interested party to submit evidence."[9] The trial court's implied finding that the Director did not preclude Cinema West from submitting evidence and the court's express finding that Cinema West's failure to do so was its own choice are supported by substantial evidence.

---

[9] Indeed, the regulations impose on all parties "a continuing duty" once a coverage proceeding is initiated, "to provide the Director . . . with relevant documents in their possession or control, until a determination is made." (Cal. Code Regs., tit. 8, § 16001.)

15

Cinema West also invokes an exception to the bar on extra-record evidence that applies where the evidence existed before an agency made its decision and the party seeking its admission**,** exercising reasonable diligence**,** could not present it to the agency before the decision was made. *Western States* indeed recognized such an exception, but emphasized that it "is to be very narrowly construed" and will apply "only in . . . rare instances." (*Western States*, *supra*, 9 Cal.4th at p. 578.)

The trial court found the facts that would justify application of this exception were not established, and substantial evidence supports this finding. Apart from observing that it acted without counsel in the proceedings initially, Cinema West makes no effort to explain why, once it received notice of the Union's request for a coverage determination, it did not offer evidence on its own behalf. The Union and the City both submitted documentary evidence, and Cinema West obviously could have done the same. Cinema West also fails to explain why, when its counsel filed the administrative appeal on its behalf, it could not then have submitted the evidence it sought later to introduce in the trial court. Its reliance on the Director's denial of a hearing does not explain or excuse its failure. Nothing prevented it from submitting declarations with its administrative appeal. Cinema West fell short of showing that it acted with diligence and was nonetheless unable to submit the evidence to the Director before she made her decisions. The trial court did not err in sustaining the Director's objections to Cinema West's extra-record evidence and concluding that the narrow exception to the extra-record evidence bar does not apply here.

For the same reasons, Cinema West's due process argument is without merit. The premise of that argument is that Cinema West was not provided a meaningful opportunity to be heard. As we have discussed, it was provided two such opportunities, chose to submit a letter and a brief, and failed to submit evidence when it could have done so. There was no deprivation of due process.

***The Hesperia Theater Development Was a Public Work
Within the Meaning of the PWL.***

Cinema West presents four arguments in support of its contention that the Hesperia theater project was not a public work: (1) private construction is not subject to prevailing wage merely because other related construction is publicly funded; (2) mere coordination of two related construction projects does not create a complete integrated "object"; (3) Cinema West has not received public funds or their equivalent; and (4) the construction of the parking lot did not transform the private theater into a public work. The first two of these arguments are premised on Cinema West's assertion, rejected by the Director and the trial court, that the theater and the parking lot were not parts of a single and integrated object. Given the centrality of this issue, we turn to it first.

Section 1720, as already noted, defines "public works" as "[c]onstruction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds." (§ 1720, subd. (a).) Since this case involves construction rather than the other types of work listed in statute, the question is whether part or all of the construction work undertaken by Cinema West and the City should be considered in assessing whether public funds were deployed.

We are not without guidance in addressing this issue. In *Oxbow Carbon & Minerals, LLC v. Department of Industrial Relations* (2011) 194 Cal.App.4th 538, 547 (*Oxbow*), the Second District addressed the scope of "construction" for purposes of section 1720. At issue was a building on a pier in Long Beach, California used for receiving and storing petroleum coke and conveying it to ships for transport. (*Oxbow*, at p. 542.) After the regional Air Quality Management District (District) amended its rules to require that coke be maintained in enclosed (i.e., non-open-air) storage, the lessee of the facility, Oxbow, planned to place a roof on it. Once it did so, an existing conveyor device (stacker) could no longer be used. (*Id.* at pp. 542–543.) For this reason, Oxbow also planned to construct new conveyors. The City of Long Beach amended its lease with Oxbow agreeing to reimburse it for construction of the new conveyors, after which title to the conveyors would be transferred to the city. (*Id.* at p. 543.) They agreed that

17

construction of the conveyors would be done in compliance with the PWL, but the lease amendment did not mention the roof. (*Oxbow*, at p. 543.) Oxbow entered a contract with one company to erect the new conveyor system and another contract with a different company to construct the roof, and it paid for the roof with private funds. (*Ibid*.) The Director and the trial court concluded that the replacement conveyors and roof were part of a " 'complete integrated object' " subjecting the entire project to the PWL (*Oxbow*, at pp. 544–545), and Oxbow appealed.

Since the dispute centered on the scope of "construction," the court focused on the meaning of that term as used in section 1720. (See *Oxbow*, *supra*, 194 Cal.App.4th at pp. 548–550.) The court noted that although "construction" is "not precisely defined in the Labor Code," the Legislature had amended section 1720, subdivision (a)(1) in 2000, broadening its meaning "to explicitly include preconstruction activities that previously were not referenced." (*Oxbow*, at p. 548.) The court also made note of dictionary definitions "cited approvingly by the Supreme Court in *City of Long Beach* [*v. Department of Industrial Relations* [2004] 34 Cal.4th 942], at page 951: 'The act of putting parts together to form a complete integrated object.' (Webster's 3d New Internat. Dict. (2002) p. 489.) '[T]he action of framing, devising, or forming by the putting together of parts; erection, building.' (3 Oxford English Dict. (2d ed. 1989) p. 794.)" (*Id.* at p. 549.) Finally, the court drew on language in *Priest v. Housing Authority* (1969) 275 Cal.App.2d 751, 756 ("As one thinks of 'construction' one ordinarily considers the entire process, including construction of basements, foundations, utility connections and the like, all of which may be required in order to erect an above-ground structure") and *Plumbers & Steamfitters, Local 290 v. Duncan* (2007) 157 Cal.App.4th 1083, 1089 ("The plain meaning of the term 'construction' includes not only the erection of a new structure but also the renovation of an existing one"). (*Oxbow*, at p. 549.) Inherent in these various definitions, the court opined, "is the concept that construction is the creation of the whole—the 'complete integrated object'—which is composed of individual parts." (*Ibid*.) The focus on a complete integrated object was also consistent with section 1720, which contains subdivisions that refer "construction" to mean "a complete product" and

18

contain none that limit the term "to the formation of individual pieces of a whole." (*Oxbow*, at p. 549 & fn. 9.) The court concluded: "A reasonably broad interpretation of a 'public work" in the context of 'construction paid in whole or in part out of public funds' is also in keeping with the purpose of the prevailing wage law [to benefit and protect employees on public works projects]." (*Id*. at pp. 549–550.)

Applying this standard to the work on the coke storage facility, the Second District declined to rely solely on the fact that there were separate construction contracts for the conveyors and the roof, because, as the Supreme Court recognized in *Lusardi*, *supra*, 1 Cal.4th at pages 987–988, "an awarding body and a contractor often have strong incentives to avoid the prevailing wage law and thus may structure their contracts to circumvent it." (*Oxbow*, *supra*, 194 Cal.App.4th at p. 550.) Instead, the court looked "at the totality of the underlying facts." (*Ibid*.) The facts on which it relied included that after the District rule was amended to prevent open-air coke facilities, the facility became unusable and Oxbow then negotiated and made plans with the City "to make the site usable again." (*Id*. at p. 551.) A memorandum from the city's director of port properties stated that " '[i]n order to accomplish' " the city's and Oxbow's "goal" of "maximiz[ing] the use of the facility in compliance with [the new rule]," " 'a roof and receiving conveyors will have to be constructed.' " (*Ibid*.) The District permit stated that "the 'petroleum coke receiving and storage system' would consist of enclosed conveyors and a storage building, and the harbor development permit noted how the work would 'bring the facility into full . . . compliance' through installation of the roof, completion of the conveyor work, and other associated tasks." (*Ibid*.) Further, the court observed that both the conveyor and enclosure work "occurred at the same site and at or near the same time," that the contracts required the work on the two to be coordinated and that both the roof and the new conveyor were necessitated by the amended rule. (*Ibid*.) Based on the totality of the facts, the court endorsed the Director's approach in finding "the conveyor and enclosure improvements 'constitute parts that are put together to form "a complete integrated object," a petroleum coke handling and storage facility' " and the trial court's

19

"similar analysis to hold that the entirety of the work was construction paid in part out of public funds." (*Id*. at p. 549.)

We find the Second District's analysis in *Oxbow* persuasive and will follow its approach, considering the totality of the facts here. The construction of the theater and the parking lot were part of the City's effort to redevelop a formerly vacant area of its downtown. Between early 2004 and late 2010, the City had constructed a city hall, branch library, and other government buildings, and was seeking "[t]o compliment" the plan for the new Civic Plaza with development of "retail, restaurant, and entertainment establishments." Prior to its dealings with Cinema West, it had been unable to attract a developer to build a movie theater within its boundaries, for predominantly financial reasons. In March 2010, Cinema West submitted a proposal to the City, the "deal points" of which included Cinema West "constructing a 38,000 square foot, twelve-screen digital theater" *and* the "[City] constructing the *necessary parking lot* and providing reciprocal access and use of said parking lot" and "developing a water retention system for the [theater] and the parking lot." (Italics added.)

As stated in the resolutions authorizing execution of the DDA, Cinema West has "*requested certain forms of [City] participation* as more fully described in the DDA," "[i]n order to ensure the sustained economic viability of the [theater]." (Italics added.) The City believed Cinema West's "proposed occupancy and use of the Site and *requested assistance pursuant thereto* [were] in the best interests of" the City and its residents. (Italics added.) The nature of that "participation" and "assistance" is made plain by the Summary Report, which describes the City's "[r]esponsibilities" as including, among other things: to "develop an on-grade parking lot adjacent to the Site for use by [Cinema West], assigns, or invitees, *as a parking lot for the movie theater*" and to "provide a reciprocal access and parking easement for the on-grade parking lot to [Cinema West]." (Italics added.) These obligations are set forth in the DDA and in the Reciprocal Access and Easement Agreement that the DDA incorporates. The DDA specifies that "[t]he Parking Lot Improvements will be designed and constructed by [City] *as necessary to serve the proposed 12-screen theater with 1,800 seats* and any other uses contemplated

20

by [City], and are planned to include" lighting, landscaping and water retention facilities. (Italics added.) The Summary Report adopted by the City describes the development of the parking lot as part of the "cost of the DDA to the [City]." Similarly, a May 12, 2011 staff report to the City's planning commission regarding entitlements, under the heading "FISCAL IMPACT" states "[t]he City will be responsible for development of the parking lot pursuant to an existing agreement with Cinema West."

The City and Cinema West agreed "to coordinate the design and construction of the Parking Lot Improvements and the [theater]." Toward that end, they agreed to use the same engineering firm to prepare the plans for the design of the parking lot and the theater. Once the parking lot was constructed, Cinema West was obligated to "maintain the Parking Lot Improvements pursuant to the CC&Rs and the reciprocal access and parking easement, including the cost of utilities (water and electricity)."

Finally, as in *Oxbow*, here the parking lot and the theater were constructed at the same time,[10] and, as the trial court observed, "were built together on the same vacant parcel of land." In the end, Cinema West's attempt to segment the development into separate components so as to avoid application of the PWL to construction of the theater is no more persuasive than the similar attempt made by the developer and city in *Oxbow*.

Cinema West seeks to distinguish *Oxbow* by arguing that "the parking lot was entirely unnecessary to the operation of the Theater, and the Theater was entirely unnecessary to the operation of the parking lot." It states "[t]he City concluded that there was sufficient public parking in its downtown area to serve the Theater even without considering the new spaces provided by the parking lot to be constructed adjacent to the Theater," and claims its evidence, if admitted, would have shown that the parking lot was not necessary to the operation of the theater. We disagree for two reasons.

First, even if the extra-record evidence Cinema West sought to submit in the trial court were considered, it does not support that broad assertion. The declaration of Steven

---

[10] Cinema West began construction of the theater in February 2012 and completed it in December 2012. The City began constructing the parking lot in April 2012 and finished "shortly before the Theater opened" in December 2012.

J. Lantsberger, the City's Economic Development Director, that Cinema West proffered in the trial court indicates that before the City's dealings with Cinema West it had planned, at some unspecified future time and subject to available funding, to construct a parking lot to support the Civic Plaza Park and surrounding uses. That does not show the City would have done so at any particular time or at all. And the fact is the City did not construct a parking lot until Cinema West proposed that it do so as part of the theater development. Nor does the Lantsberger declaration show the parking lot was unnecessary to development of the movie theater. Lantsberger states that approval of the project did not require "[Cinema West] to *construct* any on- or off-site parking," but admits that "[t]he Project was *required* to obtain a reciprocal access and parking easement from the [City] to the new Civic Plaza parking lot in exchange for [Cinema West's] maintenance of the parking lot, landscaping and the payment of utilities (water and electricity)." (Italics added.) Far from refuting the necessity of the parking lot to the theater development, the fact that the easement was required strongly suggests construction of the parking lot *was* necessary.

Second, as already discussed, the City staff reports and the agreements consistently describe the parking lot as "for the theater," "necessary to serve" the theater and a "necessary" part of the development. Even more specific is the Reciprocal Access and Parking Agreement, which recites its purpose is "*[t]o ensure . . . that the Site has access to adequate parking under the Hesperia Municipal Code.*" (Italics added.) A City staff report states the total number of parking spaces at existing government buildings that may be used in the evening was 370 and the minimum number of spaces required for the theater was 427, indicating there was not a sufficient number of existing parking spaces to meet City code requirements.[11]

---

[11] Cinema West quotes language in the DDA stating the City was constructing the parking lot "adjacent to the Civic Park and Property to serve the city park and future development on and around the Property." (Italics omitted.) That the parking lot would serve other City purposes, specifically, use by visitors to government buildings and other facilities in the Civic Plaza area, does not detract from the basic fact that it was not built

22

In short, the evidence here shows the parking lot was necessary to the theater just as the new conveyors were to the roof enclosure in *Oxbow*, and Cinema West's attempt to distinguish *Oxbow* fails.[12]  Based on all of the above facts and applying our independent judgment using the approach outlined in *Oxbow*, we conclude that the theater, parking lot and related amenities were part of a "complete integrated object" and thus constituted the "construction" done under contract, which, if "paid for in whole or in part out of public funds," constitutes a public work subject to the PWL.

This conclusion effectively disposes of Cinema West's first and second arguments.  In the abstract, we have no quarrel with those arguments—that public funding of one project does not necessarily make another privately funded project into a public work, and that "mere coordination" of two construction projects does not make both into public works.  The problem with these arguments is that they are entirely hypothetical and simply do not address the facts in this case.  That leaves Cinema West's third and fourth arguments that the Hesperia theater development was not in fact supported by public funds.  We now turn to those arguments.

---

until it became necessary to the construction of the theater and was designed and built to serve the theater.

[12]  The facts in this case have many parallels to those in *Oxbow*.  The development in each case was the product of agreements negotiated between a private entity and a city, each involved two major components, the work on the components was performed under separate construction contracts, one component was paid for by the developer and the other was paid for and would be owned by the city, the construction on both components was coordinated and performed at the same site and at or near the same time, and the publicly funded component was necessary to the developer-funded component.  (See *Oxbow*, *supra*, 194 Cal.App.4th at pp. 543–544, 545, 551–552.)  Nonetheless, Cinema West further seeks to distinguish *Oxbow* on the grounds that there both construction contracts were administered by the developer whereas here they were administered separately, and that *Oxbow* involved a roof on and conveyor within a single structure whereas here the building and parking lot were physically distinct (albeit adjacent).  In the context of the totality of the circumstances, we do not find these distinctions to be dispositive.

23

*The Project Was Paid for in Part with Public Funds Under Section 1720.*

Cinema West argues that it never received any of the funds the City committed to provide, either the forgivable loans or the one-time (re-)payment of its land purchase price. According to Cinema West, "not a penny of public funds was received by Cinema West in connection with the construction of the Theater." It contends it was unable to perform some requirements of the operating covenant and therefore did not receive or accept the forgivable loan amounts or the one-time payment described in the DDA. It cites no evidence in the record, though it reiterates its argument that it would have provided such evidence had the Director granted it a hearing. It then claims the Director based her decision on an "unproven assumption" that it did receive the promised funds. We disagree. The documents in the record, including the promissory notes and deed of trust Cinema West signed, coupled with the fact that the theater and parking lot were built, support an inference that Cinema West received or will receive the promised amounts.[13] But even if that were not the case, this argument does not change the determination that the theater here was in part publicly funded.

First, as the Director pointed out in her decision on administrative appeal, Cinema West admitted that it hoped to renegotiate the "appropriate compensation" for the Operating Covenant terms it was able to perform, and "[d]elaying the timing of the payment or renouncing it in order to renegotiate what may turn out to be a larger subsidy or even more generous terms for Cinema West cannot be used as a means to evade prevailing wage obligations." Even if renegotiation never occurs or Cinema West never receives any of the promised payments, the DDA and related agreements call for the loans and one-time payment to be made and the one-time payment is not conditional. We

---

[13] There is evidence in the administrative record suggesting the $1.5 million "forgivable loan" was not an actual cash loan but rather a contingent obligation on the part of Cinema West, if it defaulted on the operating covenant, to repay the costs the City would incur when the City developed the parking lot and refunded Cinema West's property purchase price. If that were the case, it would mean the $1.5 million forgivable loan is not itself a subsidy but an obligation to repay other subsidies under certain circumstances. However, in their briefs, neither party has contended this is the case and both disclaimed it during oral argument, and we therefore do not consider it further.

24

agree with the trial court that allowing a developer to accept public benefits and, if a later determination is made that the project is a public work, disclaim public benefits to avoid paying prevailing wages would seriously undermine the PWL. It would incentivize gamesmanship on the part of local government bodies and developers whereby projects would be publicly subsidized but constructed without PWL compliance. If an investigation later revealed the violation, the developer could still avoid paying prevailing wages and statutory penalties by repaying or disclaiming the public subsidy. And if the developer chose instead to retain the subsidy because its value exceeded the cost of post hoc PWL compliance and penalties, employees would be worse off because the passage of time and transitory nature of construction work increase the likelihood that some employees could not be found. Such a rule would discourage voluntary compliance and place undue burdens on the Department's limited enforcement personnel. This cannot have been the Legislature's intent.

Second, the cases Cinema West relies on are inapposite. *Greystone Homes, Inc. v. Cake* (2005) 135 Cal.App.4th 1 held the conveyance of a parcel and the payment of a traffic mitigation fee by a public agency to a developer did not constitute a payment of public funds because neither "constitutes a payment for actual construction which would make this Project a public work." (*Id*. at p. 11.) *City of Long Beach v. Department of Industrial Relations*, *supra*, 34 Cal.4th 942 held that a city's contribution of preconstruction costs for a project built on land leased from city did not implicate PWL. (*City of Long Beach*, at p. 954.) However, both of these cases applied a version of section 1720 that pre-dated an amendment that significantly expanded the definition of public funds to include, among other things, "[p]erformance of construction work by the state or political subdivision in execution of the project," and that expanded the definition of construction to include preconstruction activities. (*Hensel Phelps Construction Co. v. San Diego Unified Port Dist.*, *supra*, 197 Cal.App.4th at pp. 1030–1031, 1035–1036; § 1720, subd. (b)(2); 2001 Cal. Stats., ch. 937 (Sen. Bill No. 975).)

Third, we need not ultimately decide whether the allegedly unpaid forgivable loans and one-time payment to Cinema West of an amount equal to the purchase price

25

Cinema West paid for the land constitute public subsidies because Cinema West indisputably received the benefit of a newly constructed, publicly funded parking lot adjacent to the theater, which, though owned by the City, is Cinema West's and its successors' to use for as long as they operate the movie theater. Under section 1720, subdivision (b)(2), "[p]erformance of construction work by the state or political subdivision in execution of the project" counts as payment "in whole or in part out of public funds." As we have already discussed, the parking lot was necessary to the development of the theater, it was a form of City "participation" and "assistance" that Cinema West requested from the City and, as City staff described it, the publicly funded parking lot was one of the "deal points" in Cinema West's proposal. The parking lot cost the City $1.5 million to construct, and even though Cinema West's right to use it is non-exclusive the parking lot cannot be considered a de minimis contribution of public resources.[14]

### Cinema West Has Forfeited Arguments About Injunctive Relief.

In a two-paragraph section near the end of its opening brief, Cinema West challenges the trial court's rejection of its request for an injunction against ongoing proceedings by the Department to require its compliance with the PWL and to impose penalties under that statutory scheme. Earlier in the brief it describes those proceedings, which apparently were consolidated with proceedings against the contractors and subcontractors who constructed the theater and then stayed when Cinema West filed its petition for writ of mandate. Cinema West claims that in the course of those proceedings, the Department imposed penalties of $48,000 on Cinema West based on a factually unsupported estimate that it employed twenty workers on the construction of the theater. Cinema West responded to the Department's August 6, 2013 request for payroll records by stating it "did not employ anyone that performed construction work on [the project]."

Cinema West contends that section 1742 required the Department to commence a hearing within 90 days of its August 6, 2013 request. However, on October 10, 2013,

_____

[14] Cinema West states in its brief that the "total project costs" were "approximately five million dollars."

almost a month prior to expiration of the 90-day period, Cinema West filed its petition in the superior court requesting an immediate stay of the Department's proceedings. On February 27, 2014, the hearing officer assigned to the wage and hour administrative proceeding issued an order staying proceedings.

Cinema West contends the wage and hour proceedings should be enjoined for two reasons: "[b]ecause there are no facts to support [a wage and penalty assessment on Cinema West], and because Respondents have flouted their statutory responsibility to provide Cinema West with a Hearing within the statutory time limit." That is the sum and substance of its argument, for which it cites no authority nor evidence. Implicit in the first argument is the contention that a developer may not be assessed statutory penalties when it enters a construction contract that does not require compliance with the PWL. Cinema West does not even discuss that question or provide any authorities on the subject one way or the other.

The Director does not respond to the injunctive relief arguments in her respondent's brief. However, in the trial court she argued Cinema West's filing of the petition seeking an immediate stay estopped it from claiming the Department's voluntarily issued stay of the administrative proceedings violated the 90-day requirement. She also argued, citing *California Correctional Peace Officers Assn. v. State Personnel Bd*. (1995) 10 Cal.4th 1133, that the 90-day period to commence a hearing "is directory, not mandatory," "[t]he statute does not suggest that action by the hearing officer after missing the 90-day time limit is invalid," and "[a]ny judicial remedy would be limited to an order to hold the hearing." Finally, she argued Cinema West had failed to exhaust its administrative remedies.

In its reply in the trial court, Cinema West asserted the Department's assessment of penalties against it was "baseless," the delay deprived the Department of jurisdiction and Cinema West was not required to exhaust administrative remedies.

The trial court denied injunctive relief, agreeing with the Department's arguments that Cinema West had failed to exhaust its remedies, that the 90-day procedure in

27

section 1742 is directory, not mandatory, and that the "the only judicial remedy would be an order to commence the hearing."

We conclude that Cinema West has waived any challenge to the superior court's ruling on this issue by failing to provide citations to the record and authorities in its appellate brief and by failing to provide any reasoned discussion of the issues, including how any pertinent authorities apply to this case. (See Cal. Rules of Court, rule 8.204(a)(1)(B), (C); *People ex rel. City of Santa Monica v. Gabriel* (2010) 186 Cal.App.4th 882, 887; *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 865 ["the appellant must present argument and authorities on each point to which error is asserted, or else the issue is waived"]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247 [argument waived where party failed to adhere to rule requiring citation to record and failed to discuss all evidence material to his contentions].)

## DISPOSITION

The judgment of the superior court is affirmed. Respondents are awarded costs of appeal.

28

_____
                                STEWART, J.

We concur.

_____
KLINE, P.J.

_____
MILLER, J.

*Cinema West LLC v. Baker* (A144265)

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Gary Nadler

Counsel:

Peters & Peters, Mark D. Peters for Plaintiff and Appellant.

California Department of Industrial Relations, Christopher G. Jagard, Gary J. O'Mara, Ken Lau for Defendants and Respondents.

Molteni Employment Law, M. Cristina Molteni as Amicus Curiae on behalf of Defendants and Respondents.